

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

---

No. 02-21-00260-CV

---

IN THE INTEREST OF L.H., A CHILD

---

On Appeal from the 360th District Court
Tarrant County, Texas
Trial Court No. 360-687549-20

---

Before Sudderth, C.J.; Wallach and Walker, JJ.
Memorandum Opinion by Justice Walker

## MEMORANDUM OPINION

Appellant Mother appeals from the trial court's order terminating her parental rights to her infant daughter L.H. and appointing the Department of Family and Protective Services (DFPS) as L.H.'s permanent managing conservator.[1]  In a single issue, Mother contends that she received ineffective assistance from her appointed trial counsel.  We affirm.

## I.  BACKGROUND

### A.  REMOVAL AND PRETRIAL PROCEDURE

DFPS instituted a removal of L.H. from Mother's care after they both tested positive for cocaine at L.H.'s birth in the fall of 2020.[2]  DFPS petitioned to terminate Mother's parental rights, predicated mainly on Mother's drug use[3] and violent criminal history, which included multiple convictions for felony robbery and an alleged aggravated assault which occurred during the pendency of L.H.'s case.[4]  Additionally,

---

[1]We refer to the child using her initials and to other family members by their relationship to the child. *See* Tex. Fam. Code Ann. §109.002(d); Tex. R. App. P. 9.8(b)(2).

[2]DFPS also sought and obtained termination of the unknown father's parental rights; the father did not appeal the judgment.

[3]The affidavit in support of removal alleged that Mother had tested positive for cocaine, methamphetamines, and marijuana on multiple prenatal drug screens in the two months leading up to L.H.'s birth.

[4]As to the assault charge, Mother was finally convicted for misdemeanor assault after being arrested for aggravated assault with a deadly weapon in June of 2021; she remained in jail until after the termination trial.

Mother had previously had her parental rights terminated to three older children in 2017 after it was found that Mother had violated paragraphs (D) and (E) of section 161.001(b)(1) of the Texas Family Code. Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E). Mother was ordered to comply with a DFPS service plan, which required her to engage in counseling, a drug assessment and any recommended drug treatment, random drug testing, a psychological evaluation, a parenting class, and maintain stable housing and employment.

Desaray Muma was appointed to represent Mother in both the 2017 termination case and L.H.'s case. The record shows that Muma attended all status hearings held in L.H.'s case but does not show that Muma propounded any written discovery upon DFPS.

## B. TERMINATION TRIAL

At the trial in July 2021, the DFPS caseworker testified that L.H. tested positive for cocaine at birth. Though Mother completed a parenting class, she did not complete any other services and failed to submit to drug testing on four occasions, tested positive for high levels of cocaine on a hair follicle test, and visited only sporadically with L.H. The caseworker also confirmed that Mother had a history of violent criminal conduct and had been jailed since early June 2021 after being arrested for aggravated assault.

Over Muma's hearsay objection, DFPS admitted drug test results showing that Mother had tested positive for cocaine and other illegal drugs on a hair follicle test in

3

December 2020.  DFPS also admitted (1) judgments showing that Mother had been convicted of felony robbery on two occasions for offenses that occurred in 2015 and 2017 and (2) a June 1, 2021 indictment alleging that Mother had committed aggravated assault with a deadly weapon.

Mother testified[5] that she had completed parenting classes, some counseling, and had been receiving unemployment benefits since December 2020 after being laid off due to the Covid-19 pandemic.  She confirmed past drug use but expressed concern that her mental health medications may have caused the most recent positive results.  According to Mother, she and L.H. had a bonded relationship, and she only missed certain visits due to unreliable transportation.  Mother expressed a desire to be reunited with L.H. and explained that she was in a drug rehabilitation program that would help her and L.H. to become reacquainted once Mother was released from jail.

Before cross-examination, Muma informed Mother on the record that Mother had a right against self-incrimination: "[S]o I don't want you to talk about your current criminal charge, okay?"  During Mother's cross-examination, Muma interjected twice on the record to advise Mother that it was okay to answer certain questions concerning Mother's criminal history.

_____

[5]Mother was brought to the trial from jail upon a bench warrant issued upon Muma's request.

## C. ORDER OF TERMINATION

The trial court terminated Mother's parental rights to L.H. after finding that Mother had violated (D) and (E) grounds[6] and that termination was in L.H.'s best interest and appointed DFPS as L.H.'s permanent managing conservator. Of relevance, the order stated that "[a] jury was waived" and was approved as to form by counsel for DFPS and the unknown father, the attorney ad litem, and Muma. Mother filed a motion for new trial, arguing that Muma provided ineffective assistance. The trial court denied Mother's motion after hearing testimony on the issue. No formal findings of fact or conclusions of law were requested or filed, but before signing the denial order, the trial judge signed its "Rendition on Motion for New Trial" with extensive findings.

## D. MOTION FOR NEW TRIAL EVIDENCE

To support her motion for new trial, Mother attached her entire client file in L.H.'s case as supplied to her by Muma. Among many documents, the file contained dozens of emails from Muma to Mother[7] and others, various status reports from DFPS and other court-appointed entities related to L.H.'s case, and handwritten notes of phone conferences held between Muma and Mother. The emails showed that Muma: repeatedly informed Mother of hearing settings; counseled her regarding

---

[6]*See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (b)(2).

[7]We refrain from providing Mother's email address for privacy reasons, but the record confirms that Muma sent the emails to Mother's correct email address.

proper Zoom-hearing etiquette; implored Mother to contact Muma regarding the case; informed Mother about adoption and relinquishment; repeatedly admonished Mother to complete her service plan; and helped resolve issues such as determining the identity of the unknown father and finding a family placement for L.H.

Mother also attached to her motion an affidavit from Muma which substantively read in full:

> I represented [Mother].  During the beginning of the case, we had good communication.  In January of 2021, [Mother] stopped communicating with me.  I sent multiple emails from January to June that went unanswered.  In June of 2021, I found out that [Mother] was incarcerated.  I wrote to her, but she did not respond.
>
> Because of our poor communication, [Mother] and I never had the opportunity to discuss a bench trial versus a jury trial.

At the hearing on her motion, Mother testified that Muma did not inform her of her rights to a jury trial or against self-incrimination until the day of the trial in L.H.'s case.  She also claimed to have arrived at the trial believing that it was related to her parental rights to her three older children who were the subject of her prior termination suit in 2017.  Mother based this belief on a June 17, 2021 letter from Muma that Mother received while in jail informing her of the trial date but mistakenly captioned with the initials of her three older children and the case number associated with their earlier termination suit.  Mother stated that it "messed [her] up in [her] mind" to learn that the trial was not, in fact, an opportunity to regain custody of her

6

older children. This made it difficult, she said, to then testify regarding L.H.'s termination: "I wasn't prepared; I wasn't ready."

Mother also testified to strained communication with Muma throughout Muma's representation:

> [MOTHER'S APPELLATE COUNSEL]: Ok. And did you have regular access to email?
>
> [MOTHER]: Yes, but some of the email correspondence that [Muma] was sending me, I wasn't never getting them. And when they did come in, it was late. Like, when it was time for me to go to court or something like that, it was sent, like, around that same week.
>
> So when I called [Muma] to try to discuss it with her, she'll try to quickly rush me up off the phone, and then tell me what I need to do or what need [sic] to be doing now. And that's the way it's supposed to be or how it's supposed to be done.
>
> . . . .
>
> [MOTHER'S APPELLATE COUNSEL]: How many times would you say you called Ms. Muma or called her office to talk to her?
>
> [MOTHER] I called her very multiple [sic] times to talk to her.
>
> . . . .
>
> [MOTHER'S APPELLATE COUNSEL:]: Would you please describe Ms. Muma's reaction when you called her?
>
> [MOTHER]: I feel that she didn't have no concern. I felt that she didn't care. I felt that - - and there was multiple times where I was hurried trying to explain to her what should I do, how should we go about doing this? She would tell me, "If they don't do this, they don't do that, I'm going to push the issue." That never occurred.
>
> "I'm going to do this, and I'm going to do that," that never occurred. Days and days and months and months went by. I was still

7

stuck in the same boat, going through the same thing. Going through my classes, finishing up my resource and doing everything I can to try to get my child out the [sic] system.

And I didn't have no help with my lawyer, I didn't have no - - I didn't. I didn't have that support with her.

Mother contended that Muma never visited Mother while she was in jail. Further, she claimed to have received no notice of any of the hearings in L.H.'s case and that she would have attended them had she known about them. Importantly, Mother never testified that she would have opted for a jury had Muma informed her of her right to one.

Muma testified that communication between her and Mother was strong at the outset of L.H.'s case but that she and Mother did not speak after November 2020, apart from Mother responding to a single email in April 2021. Though Muma did not visit Mother in jail, Muma sent a letter informing her of the trial in L.H.'s case and provided a self-stamped, self-addressed envelope for Mother to use to respond. Muma stated that Mother was accustomed to writing Muma from jail—this was something Mother had done in her earlier case in 2016 and 2017. But when Mother did not respond to this letter, Muma assumed that Mother ignored it like Mother had ignored Muma's recent emails.

Additionally, Muma stated that she had been unaware of the erroneous caption on the letter until Mother testified about it. She explained that she had accidentally used an old form from Mother's previous case when she drafted the letter, but that

8

Mother had made no indication that she was confused or upset by this on the day of the trial.

When asked why she never visited Mother in jail, Muma responded that she would have visited Mother had she responded to Muma's letter and requested a meeting. According to Muma, her practice was to place the burden on her clients to schedule meetings regarding their cases. Further, Muma testified that she tried to prepare Mother for the trial, but this did not occur because Mother did not respond to Muma's emails.

Muma confirmed that she did not inform Mother of her rights to a jury trial and against self-incrimination until the day of the trial. She contended that Mother waived her right to a jury trial by failing to communicate with her in the months before the trial.

## II. STANDARD OF REVIEW AND APPLICABLE LAW

A parent who responds in opposition to a government-initiated parental-rights-termination suit may assert a claim for ineffective assistance of counsel. *In re D.T.*, 625 S.W.3d 62, 73 (Tex. 2021). Courts analyze the effectiveness of counsel in parental-rights-termination cases under the same two-pronged *Strickland* test as utilized in the criminal context.[8] *Strickland v. Washington*, 466 U.S. 668, 688–93, 104

---

[8]Though civil in nature, Texas courts often seek guidance from criminal cases when analyzing ineffective assistance claims in parental-rights-termination cases. *See, e.g., In re D.T.*, 625 S.W.3d 62, 73–75 (Tex. 2021); *In re M.S.*, 115 S.W.3d 534, 549–50 (Tex. 2003); *In Interest of G.H.*, No. 02-14-00261-CV, 2015 WL 3827703, at *17–18

S. Ct. 2052, 2064–68 (1984); *In re M.S.*, 115 S.W.3d 534, 545 (Tex. 2003). To establish ineffective assistance, an appellant must prove by a preponderance of the evidence (1) that her counsel's representation was deficient and (2) that the deficiency prejudiced her defense. *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064; *In re M.S.*, 115 S.W.3d at 545.

In evaluating counsel's effectiveness under the deficient-performance prong, we review the totality of the representation and the particular circumstances of the case to determine whether counsel provided reasonable assistance under all the circumstances and prevailing professional norms at the time of the alleged error. *See Strickland*, 466 U.S. at 688–89, 104 S. Ct. at 2065; *Nava v. State*, 415 S.W.3d 289, 307 (Tex. Crim. App. 2013); *In re M.S.*, 115 S.W.3d at 545. Our review of counsel's representation is highly deferential, and we indulge a strong presumption that counsel's conduct was not deficient. *In re M.S.*, 115 S.W.3d at 545.

*Strickland*'s prejudice prong requires a showing that counsel's errors were so serious that they deprived the defendant of a fair trial—that is, a trial with a reliable result. *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064. In other words, an appellant must show a reasonable probability that the proceeding would have turned out

---

(Tex. App.—Fort Worth June 18, 2015, no pet.) (mem. op.); *Walker v. Dep't of Fam. & Protective Servs.*, 312 S.W.3d 608, 624–25 (Tex. App.—Houston [1st Dist.] 2009, pet. denied).

10

differently without the deficient performance. *Id.* at 694, 104 S. Ct. at 2068; *Nava*, 415 S.W.3d at 308.

### III. ANALYSIS

Mother presents a laundry list of alleged failures to show Muma's ineffectiveness. Specifically, she contends that Muma (1) did not inform Mother of her right to a jury trial although Muma signed the termination order which stated that Mother waived a jury trial; (2) used an old form letter captioned with a different case involving her older children; (3) never advised Mother before the day of the trial of her right not to incriminate herself; (4) never gave Mother notice of any hearings in L.H.'s case; (5) did not seek a continuance for a permanency conference when she learned that Mother was in jail; (6) never visited Mother in jail; (7) assumed Mother ignored her correspondence and did not investigate why Mother was nonresponsive; (8) put the burden on Mother to request a meeting with her; (9) propounded no discovery to DFPS; (10) filed no pretrial motions; (11) failed to seek a hearing or ruling on her special exceptions; (12) failed to request a record of pretrial proceedings; (13) did not interview witnesses; (14) issued no subpoenas to potential witnesses; (15) ordered no records supporting Mother's legal position; (16) did not investigate any claims; (17) did not request a toxicologist to evaluate the effect Mother's prescription medications had on her drug test results; (18) did not supply Mother with copies of DFPS permanency reports; (19) did not meet with Mother to prepare her for the trial; (20) did not speak with Mother from February 2020 until the day of the

11

trial; (21) spent no time preparing for the trial; (22) waived opening statement and closing argument at the trial; (23) made only one objection at the trial; and (24) failed to adequately cross-examine the DFPS witness at the trial.[9]

## A. WE DO NOT APPLY *CRONIC*

Citing *United States v. Cronic*, 466 U.S. 648, 104 S. Ct. 2039 (1984), Mother contends that we should presume the prejudice prong of *Strickland* is met in her case because Muma's representation—encapsulating both pretrial and trial performance—was such that Mother "was constructively without the benefit of counsel because [Muma] did nothing more than go through the procedural motions" and acted effectively as "an arm of the State." We disagree.

Under *Cronic*, an appellant is entitled to a legal presumption of prejudice if she can demonstrate that her counsel "entirely fail[ed] to subject the prosecution's case to meaningful adversarial testing," so that there was a constructive denial of the assistance of counsel altogether. *Cronic*, 466 U.S. at 659, 104 S. Ct. at 2047. But counsel's failure to test the prosecution's case must be "complete" before prejudice is presumed. *Bell v. Cone*, 535 U.S. 685, 696–97, 122 S. Ct. 1843, 1851 (2002). The standards distinguish between "shoddy representation" and "no defense at all." *In re S.B.*, No. 02-18-00310-CV, 2019 WL 1388760, at *15 (Tex. App.—Fort Worth Mar. 28, 2019, pet. denied) (per curiam) (mem. op.). "[B]ad lawyering, regardless of

---

[9]For brevity we have condensed and combined multiple similar complaints raised by Mother into 24 complaints.

12

*how* bad, does not" justify applying *Cronic*. *Id.* (quoting *Childress v. Johnson*, 103 F.3d 1221, 1229 (5th Cir. 1997)). Thus, the *Cronic* presumption will only apply when an appellant establishes that her counsel was inert rather than simply incompetent. *Id.*; *see Ex parte McFarland*, 163 S.W.3d 743, 752 (Tex. Crim. App. 2005) ("This prong of *Cronic* is epitomized by the 'inert' or 'potted plant' lawyer who, although physically and mentally present in the courtroom, fails to provide (or is prevented from providing) *any* meaningful assistance.").

Muma was not a potted plant. The record shows that, over the course of L.H.'s case, Muma:

- sent dozens of emails to Mother and others related to the case;

- conferenced with Mother by phone multiple times;

- repeatedly informed mother of hearing dates and times;

- filed answers to DFPS's original and amended petitions;

- provided Mother with links to attend Zoom hearings and information about proper Zoom-hearing etiquette;

- repeatedly requested Mother to call Muma's office to discuss the case;

- repeatedly admonished Mother to complete her service plan;

- informed Mother about adoption and relinquishment;

- aided in investigating the identity of L.H.'s father;

- aided in the attempt to place L.H. with various family members requested by Mother;

13

- attended scheduled hearings;

- ensured that a bench warrant issued for Mother to attend the trial;

- objected to the admission of drug-test evidence;

- cross-examined DFPS's witness;

- called Mother as a witness in Mother's defense, which provided the trial court with an alternative to termination by eliciting Mother's desire to be named as a possessory conservator and her plan to enter a drug rehabilitation facility that housed mothers with their children; and

- counseled Mother regarding the advisability of answering certain questions while Mother testified on cross-examination.

Thus, the record does not reflect a "complete" failure by Muma in her representation of Mother or her testing of DFPS's case against Mother; we decline to apply *Cronic* to her complaint. *See In re S.B.*, 2019 WL 1388760 at *15 (declining to apply *Cronic* where appellant mother complained of laundry list of pre-trial and trial complaints of ineffective assistance in a parental-rights-termination case).

## B. APPLICATION OF STRICKLAND

Having concluded that *Cronic* does not apply, we must now determine whether Mother has satisfied both prongs of *Strickland*. *In re M.S.*, 115 S.W.3d at 545. Without deciding whether Muma's performance was deficient,[10] we will hold that Mother has

---

[10]We need not address both prongs of the *Strickland* test if the appellant makes an insufficient showing on one component, nor must we address them in any particular order. *Strickland*, 466 U.S. at 697, 104 S. Ct. at 2069.

14

failed to show that she was prejudiced by any of Muma's actions. *See Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068.

### 1. Mother Was Not Prejudiced By Muma's Failing to Inform Her of Right to Jury Trial

Mother's chief complaint concerns Muma's failing to inform her of her right to a jury trial. In addressing how she was prejudiced by this, Mother asserts—without support—that "[w]hen trial counsel trespasses on the constitutional rights of her client, the trespass itself is prejudice." She also highlights certain benefits to presenting a case to a jury rather than a judge, such as the differences in the admission and exclusion of evidence and the perceptions of a single fact finder versus that of a diverse set of 12 peers.

In the context of the waiver of a jury proceeding, the proper measure of prejudice for an attorney's deficient performance is "whether there is a reasonable likelihood that the defendant would have opted for the proceeding if his attorney had performed adequately." *Miller v. State*, 548 S.W.3d 497, 502 (Tex. Crim. App. 2018) (citing *Lee v. United States*, 137 S. Ct. 1958, 1965 (2017). Here, then, we must determine given the record whether Mother has shown that a reasonable likelihood existed that she would have requested a jury trial had Muma timely informed her of her right to elect one. Mother herself never testified that she desired a jury trial; thus, our analysis turns on other record evidence.

15

Apart from a single email to Muma in April 2021 and the completion of a parenting class, Mother made no attempt to communicate with Muma about L.H.'s case for eight months; did not respond to Muma's letter in jail despite Mother admitting to receiving it and it being accompanied by a self-addressed, self-stamped envelope; did not complete individual counseling; did not complete her drug assessment; did not complete her psychological evaluation; did not find stable housing or employment; refused to submit to drug testing on four occasions; tested positive for high levels of cocaine on a hair follicle test in December 2020; sporadically attended visitations with L.H.; and was jailed on an aggravated assault charge six weeks before the trial.

Given Mother's near-total lack of engagement in L.H.'s case,[11] we are not persuaded that it was reasonably likely that Mother would have requested a jury trial even had Muma timely informed her of the existence of that right. *See Miller v. State*, No. 05-14-01065-CR, 2018 WL 4579788, at *3 (Tex. App.—Dallas Sept. 25, 2018, pet. denied) (mem. op., not designated for publication) (holding that appellant did not meet his burden under *Strickland's* prejudice prong to show that he would have opted for a jury trial rather than a bench trial if his attorney had correctly advised him that he would not be probation eligible after conviction from a judge).

---

[11]The trial court stated in its rendition on Mother's motion for new trial that "[Mother] was completely disengaged in the process after February 5, 2021." The court also noted that it is uncommon for a parent to take a termination trial to a jury: "Jury trials in termination cases are not the norm, they are the exception."

Relatedly, Mother argues that she did not expressly waive her right to a jury trial and, thus, Muma was ineffective when she signed the termination order—which indicated that Mother had waived her right to a jury trial. Mother incorrectly conflates the right to a jury trial in a parental-rights-termination case with that afforded criminal defendants. The law does not require an express waiver of the right to a jury trial in parental-termination-rights cases. *In re K.M.H.*, 181 S.W.3d 1, 8 (Tex. App.—Houston [14th Dist.] 2005, no pet.). Instead, a party is entitled to a civil jury trial only if the party first makes a written request for a jury trial and pays the jury fee at least thirty days before the date of trial. Tex. R. Civ. P. 216; *see* Tex. Fam. Code Ann. § 105.002 (providing that "a party *may* demand a jury trial" in parental-rights-termination cases) (emphasis added); *In re A.L.M.-F.*, 593 S.W.3d 271, 275 (Tex. 2019) ("Under our permissive statute, parties may demand a jury trial or elect to have a judge decide a termination case on the merits.").

Accordingly, and in light of Mother's lack of engagement in the case as set forth above, we hold that Mother has not borne her burden to show a reasonable probability that, but for Muma's actions, she would have requested a jury trial.

### 2. Mother Was Not Prejudiced By Muma's Erroneously-Captioned Letter

Mother next contends that she was prejudiced by the letter sent by Muma which informed Mother of the trial date in L.H.'s case but was captioned with the initials of her older children and the case number from their termination suit. She

17

argues that this "caused [Mother] so much emotional stress on the day of trial, that when [Mother] learned that the trial was for L.H. in the instant case, she had a difficult time answering questions." We fail to see from the record how Muma's mistake—unfortunate as it may have been—caused Mother so much turmoil as to undermine the results of the trial.

The record does not indicate that Mother had difficulty testifying—she provided cohesive and comprehensive answers to the questions propounded to her and did not inform Muma on the day of the trial that she was confused or distraught. Further, Mother has not challenged the evidence supporting the order to terminate her parental rights and, thus, we presume it was sufficient. *See Radio Station WQCK v. T.M. Communications, Inc.*, 744 S.W.2d 676, 676–77 (Tex. App.—Dallas 1988, no pet.) ("It is axiomatic that there is a presumption of evidential sufficiency on appeal . . . ."); *see also In re J.P.-L.*, 592 S.W.3d 559, 577 (Tex. App.—Fort Worth 2019, pet. denied) (holding that mother's attorney was not ineffective where mother conceded the sufficiency of the evidence to terminate her parental rights; thus, any alleged ineffectiveness did not render the outcome unreliable); *In re A.B.*, 372 S.W.3d 273, 276 (Tex. App.—Fort Worth, 2012, no pet.) (holding no prejudice under *Strickland* in part because appellant-father did not challenge the trial court's conclusions of law for termination). And our review of the record finds ample support for this presumption—the evidence showed that L.H. was born with cocaine in her system

18

and that Mother engaged in drug use and violent criminal behavior before and after L.H.'s suit was filed.

Accordingly, Mother has not shown prejudice to a degree that it is reasonably probable that the outcome of the trial would have been different had Muma not sent the erroneously-captioned letter.

### 3. Mother Failed to Show Prejudice for Complaints Three Through Twenty-Four

As to the remaining complaints from Mother's laundry list—numbers three through twenty-four—she does not adequately explain how any of these alleged failures by Muma were prejudicial to her defense. Mother's remaining argument that she was prejudiced by any of Muma's actions is that Muma's failure to "investigate, collect information, or exercise the right to discovery" meant that Mother "effectively went to trial without any trial strategy."

However, these conclusory statements are essentially a repetition of Mother's argument from *Cronic* urging us to presume prejudice—which we overruled—and are not sufficient to bear Mother's burden to show how, but for each of these actions, it is reasonably probable that the outcome of the trial would have been different. *See In re G.H.*, No. 02-14-00261-CV, 2015 WL 3827703, *18 (Tex. App.—Fort Worth June 18, 2015, no pet.) (holding that conclusory statement that, but for counsel's actions, "a different result could have been obtained" was not sufficient to show prejudice).

19

Ineffective assistance claims based on trial counsel's general failure to investigate facts, collect information, or engage in discovery fail absent showings of what the investigation or discovery would have uncovered that reasonably could have changed the outcome of the case. *Cooks v. State*, 240 S.W.3d 906, 912 (Tex. Crim. App. 2007) (holding no prejudice for failure to show what investigation would have revealed); *Stokes v. State*, 298 S.W.3d 428, 432 (Tex. App.—Houston [14th Dist.] 2009, pet. ref'd) (same); *In re K.S.*, 420 S.W.3d 852, 856–57 (Tex. App.—Texarkana 2014, no pet.) (holding no prejudice in a parental-rights-termination case for failure to show what propounded discovery would have uncovered that trial counsel was not already aware of through having access to DFPS information and attending multiple status hearings); *In re R.E.T.R.*, No. 14-13-00640-CV, 2013 WL 6506689, at *11 (Tex. App.—Houston [14th Dist.] Dec. 10,  no pet.) (mem. op.) (same).

Here, Mother alerts us to no evidence or facts that Muma may have discovered through a more thorough investigation or by propounding written discovery on DFPS. The record shows that, while Muma did not propound discovery, she was in receipt of or had access to most of DFPS's case information—including caseworker and CASA status reports, Mother's drug test results, and affidavits from the investigation.[12]  Further, Muma had represented Mother before, attended all pretrial

---

[12]At the hearing on Mother's motion for new trial, counsel for DFPS pointed out that attorneys in termination cases are provided with significant amounts of information through the filing of reports and attendance at required hearings: "We file our permanency reports with the court.  The attorneys get those.  There's so much

hearings, and had been involved with L.H.'s case for nearly a year. Thus, the record indicates that Muma had a strong understanding of the facts of the case and the parties involved. *See In re K.S.*, 420 S.W.3d at 856–57.

Mother made no showing of facts or information that may have been uncovered by Muma through investigation or discovery that may reasonably have changed the outcome of the case. In light of this, and given the weight of the evidence in favor of the termination order and Mother's failure to challenge the evidence, we conclude that Mother has not shown that she was prejudiced by the actions alleged in complaints three through twenty-four. Accordingly, we overrule Mother's arguments related to these complaints.

## IV. CONCLUSION

Having overruled all of Mother's complaints, we affirm the trial court's judgment.

/s/ Brian Walker
Brian Walker
Justice

Delivered: January 27, 2022

---

information on those. I think [mother's appellate counsel's] assumption that you have to send [DFPS] discovery to know what's going on in a case is inaccurate."

21